**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**


**17th STREET ASSOCIATES, LLP,**

      **Plaintiff,**


      **v.**　　　　　　　　　　　　　　**Civil Action No. 2:04cv681**


**MARKEL INTERNATIONAL
INSURANCE COMPANY LIMITED,**

**CERTAIN UNDERWRITERS
AT LLOYDS, LONDON,**

**RAPHAEL & ASSOCIATES, TPA**

**ALAN J. STOLZBERG,**

**ASSOCIATED ADJUSTERS, INC.,**

**and**

**HOWARD J. THOMAS,**

      **Defendants.**


<u>**MEMORANDUM OPINION AND ORDER**</u>

      Plaintiff filed a motion for judgment in the Circuit Court of the City of Virginia Beach,

Virginia alleging that Defendants, an insurer and its agents, breached an insurance agreement and

committed intentional misconduct and acted in bad faith to deprive it of a business expectancy

separate and apart from the insurance agreement.  Defendants, two of which hail from the United

1

Kingdom, two from New Jersey, and two from the Commonwealth, filed a petition for removal alleging that only the insurer, a British corporation, is a real party in interest to the suit. The petition urges this Court to exercise removal jurisdiction on the ground of diversity and alienage and to dismiss the remaining defendants pursuant to the fraudulent joinder doctrine.

At bottom, this is a garden variety coverage claim against an insurer cloaked in the garb of a complex business tort for the tactical purpose of defeating diversity and alienage jurisdiction (and perhaps in the hope of recovering punitive damages). That said, this case, unwittingly perhaps, also touches upon peculiarly federal interests involving federal alienage jurisdiction and fundamental federalism principles that strongly favor the exercise of removal jurisdiction. For the reasons that follow, this matter will remain where it belongs: in federal court.[1]

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

        A.      **Factual Background**

        Plaintiff 17th Street Associates, LLP ("17th Street"), a limited liability partnership organized under the laws of the Commonwealth of Virginia, is the fee simple owner of a tract of land known as the "Peppers Property," which contains a two-story building that at one time housed a beauty shop, restaurant, and residential apartments. 17th Street rents units within the Peppers Property to residential and commercial tenants pursuant to oral month-to-month lease agreements.

---

[1]In Linnin v. Michielsens, ___ F. Supp.2d ___ (E.D. Va. June __, 2005, Case No. 2:05cv108), released on the same day as this Memorandum Opinion and Order, this Court also denies the plaintiff's motion to remand. Although the cases are factually distinct, they present similar legal issues involving diversity and removal jurisdiction and the "fraudulent joinder" doctrine. To avoid redundancy in both Opinions, this Court will refer to the other on occasion.

2

According to the complaint, 17th Street entered into an Insurance Agreement (the "Agreement") on or about February 28, 2003 with Defendant Markel International Limited ("Markel") to insure the Peppers Property through February 28, 2004.  Markel is a non-United States insurer organized under the laws of the United Kingdom with its principal place of business in London, England.  Markel is apparently eligible to provide insurance in the Commonwealth of Virginia.  The coverage required by the Agreement was allegedly provided by Defendants Certain Underwriters at Lloyd's London ("Certain Underwriters"), all of which are apparently organized under the laws of the United Kingdom and maintain their principal places of business in London, England.  Despite not being licensed and regulated by the Virginia State Corporation Commission, the Certain Underwriters are apparently authorized to issue surplus lines insurance in Virginia.

The Peppers Property sustained fire damage on December 3, 2003.  Following the fire, 17th Street claims to have taken the steps necessary under the Agreement to file an insurance claim (the "Claim"), including submitting a sworn proof of loss detailing the damage caused by the fire.  Thereafter, Markel apparently assigned the Claim's adjustment to Defendant Raphael & Associates, TPA ("Raphael & Associates"), a claims management administration firm organized under the laws of the State of New Jersey and maintaining its principal place of business there.  Defendant Alan J. Stolzberg ("Stolzberg"), a property division supervisor for Raphael & Associates, and a resident, domiciliary, and citizen of New Jersey, was assigned responsibility for adjusting the Claim on behalf of Raphael & Associates.  Stolzberg in turn allegedly engaged the services of Defendant Associated Adjusters, Inc. ("Associated Adjusters"), a local adjustment company organized under the laws of the Commonwealth and maintaining its principal place of

3

business in Virginia Beach, Virginia.  Defendant Howard J. Thomas, an employee of Associated

Adjusters and a resident and domiciliary of Virginia, was placed in charge of adjusting the Claim

for Associated Adjusters.

To date, the Claim has not been paid and the Peppers Property has not been restored to its

pre-fire condition.  This prompted 17th Street to file a motion for judgment in the Circuit Court

of the City of Virginia Beach, Virginia on September 20, 2004.  In addition to claiming to be

owed compensation to conduct repairs on the Peppers Property pursuant to the Insurance

Agreement, 17th Street also claims that Defendants committed intentional misconduct and acted

in bad faith, which deprived it of a business expectancy from the alleged oral lease agreements it

once had with its tenants.  Accordingly, the motion for judgment, or complaint, contains one

count sounding in contract and another sounding in tort.

### B.    Procedural Posture

Under the federal removal statute, a defendant may remove "[a]ny civil action brought in

a State court of which the district courts of the United States have original jurisdiction . . . to the

district court for the United States for the district and division embracing the place where such

action is pending."  28 U.S.C. § 1441(a).  Defendants filed a petition for removal on November

12, 2004,[2] contending that the dispute should be litigated in federal court because there are only

two real parties in interest: Plaintiff 17th Street (Virginia) and Defendant Markel (United

Kingdom).  They contend that the other parties named in the suit were fraudulently joined to

---

[2]As required by 28 U.S.C. §§ 1446(a) and (b), which prescribe procedures for removal, all
Defendants have joined in the petition on removal.  See Unicom Sys. Inc. v. Nat'l Louis Univ.,
262 F. Supp.2d 638, 640-41 (E.D. Va. 2003) (Ellis, J.) ("Courts have uniformly construed [§§
1446(a) and (b)] as requiring *all* defendants, who may properly do so, to join in or otherwise
consent to the removal notice.").

defeat diversity and alienage jurisdiction.  Accordingly, Defendants' removal petition urges this

Court to invoke the "fraudulent joinder" doctrine, which would permit the Court to dismiss all

Defendants but Markel and to exert removal jurisdiction pursuant to the diversity and alienage

provisions of the federal jurisdictional statutory scheme.  See id. § 1332(a)(2) ("The [federal]

district courts shall have original jurisdiction of all civil actions where the matter in controversy

exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens

of a State and citizens or subjects of a foreign state."); id. § 1441(b) (granting removal

jurisdiction to federal district courts over certain suits involving non-federal questions where

"none of the parties in interest properly joined and served as defendants is a citizen of the State in

which such action is brought").

     17th Street countered the removal petition with a motion to remand the case to state

court.  The motion alleges that each Defendant named in the suit is a real party in interest to the

controversy and is therefore properly joined.  As Defendants Associated Adjusters and Thomas

are citizens of the Commonwealth, 17th Street urges that the case be remanded on the ground

that, absent complete diversity, this Court lacks subject matter jurisdiction to adjudicate the

dispute.  See id. § 1447(c) ("If at any time before final judgment it appears that the district court

lacks subject matter jurisdiction, the case shall be remanded.").

     It is undisputed that the claims pled are based on Virginia law and do not involve a

federal question.  Thus, the only question before this Court is whether it may exert removal

jurisdiction on the basis of diversity and alienage and dismiss the non-diverse Defendants

pursuant to the "fraudulent joinder" doctrine.  Having reviewed the parties' memoranda and

entertained oral argument on February 17, 2005, the question is ripe for judicial resolution.[3]

## II.    LEGAL STANDARD

### A.    Removal Jurisdiction

The threshold question in any matter brought before a federal court is whether the court has jurisdiction to resolve the controversy involved.  The obligation to ascertain the basis for jurisdictional authority "'spring[s] from the nature and limits of the judicial power of the United States" and is 'inflexible and without exception.'"  Steel Co. v. Citizens for a Better Env't, 424 U.S. 83, 94-95 (1998) (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).

"The burden of establishing federal jurisdiction is placed upon the party seeking removal."  Mulcahey v. Columbia Organic Chemicals Co., Inc., 29 F.3d 148, 151 (4th Cir. 1994) (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92 (1921)).  Removal statutes are strictly construed because of the "significant federalism concerns" implicated by divesting a state court of jurisdiction over a matter originally brought before it.  Id. (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100 (1941)).  Thus, "[i]f federal jurisdiction is doubtful, a remand is necessary."  Id.; see also Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815-16 (4th Cir. 2004); Sonoco Products v. Physicians Health Plan, Inc., 338 F.3d 366, 370 (4th Cir. 2003).  Before

---

[3]Defendants also filed a motion to dismiss for failure to state a claim upon which relief can be granted on December 1, 2004.  Fed. R. Civ. P. 12(b)(6).  The motion to dismiss contends that the claim for intentional misconduct and bad faith should be dismissed because Virginia does not recognize a cause of action in tort where the only duties alleged arise in contract.  The motion further urges the Court to dismiss every Defendant except for Markel from the contract claim on the ground that only Markel is in privity of contract with 17th Street.  For reasons that will become apparent upon resolution of the petition for removal and motion to remand, Defendants' motion to dismiss is moot.

reaching the merits of the instant removal petition, the strict construal of removal statutes, as well as the apparent federalism concerns raised by consideration of a removal petition, necessitate additional context and discussion.

The strict construal of removal statutes serves dual ends.  First, it ensures that the parties to a lawsuit are not exposed to "a final judgment in a federal court, only to have it determined [on appeal] that the court lacked jurisdiction on removal." Thompson v. Gillen, 491 F. Supp. 24, 26 (E.D. Va. 1980) (Warriner, J.).  Second, "the exercise of removal jurisdiction[,] particularly when based on diversity[,] is in derogation of State sovereignty." Id.  To avoid unnecessarily derogating state sovereignty, federal courts "must take care not to assume jurisdiction of a case or controversy that belongs exclusively before a State tribunal." Id. at 27; see also, e.g., Shamrock Oil, 313 U.S. at 109 ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined. [internal quotations omitted]."); Adams v. Aero Servs. Intern, Inc., 657 F. Supp. 519, 521 (E.D. Va. 1987) (Williams, J.) ("Removal of civil cases to federal court is an infringement on state sovereignty.").

However, when faced with a challenge to jurisdictional authority, in particular to removal authority, a federal court is obliged to do more than simply point jurisdictional traffic in the direction of state courts.  For starters, "by providing for removal in the first place, Congress seems to believe that the defendant's right to remove a case that could be heard in federal court is at least as important as the plaintiff's right to the forum of his choice." McKinney v. Bd. of Trs., 955 F.2d 924, 927 (4th Cir. 1992); cf. Alabama Great S. Ry. Co. v. Thompson, 200 U.S. 206, 218 (1906) ("[T]he Federal courts may and should take such action as will defeat attempts to

wrongfully deprive parties entitled to sue in the Federal courts of the protection of their rights in those tribunals."); Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 348 (1816) (Marshall, C.J.) (emphasizing that federal jurisdiction is "not to be exercised exclusively for the benefit of parties who might be plaintiffs, and would elect the national forum, but also for the protection of defendants who might be entitled to try their rights, or assert their privileges, before the same forum").  Moreover, the Constitution itself demarcates the boundaries of federal jurisdictional authority.  Those boundaries, outlined in Article III, section 2, were not drawn haphazardly.  Rather, along with the jurisdictional statutory scheme enacted by Congress, the boundaries insulate peculiarly federal interests from adjudication by non-federal tribunals where they may be subordinated to provincial interests.  Thus, questions concerning jurisdictional authority invariably involve issues of constitutional importance, which by their nature deserve careful consideration.  See discussion infra Part II.C.2 and III.B.

The obligation to carefully scrutinize removal jurisdiction is enhanced further by the fact that "[t]he district court has [only] one shot, right or wrong" at deciding its removal jurisdiction. In re Providencia Dev. Corp., 406 F.2d 251, 253 (1st Cir. 1969).  The federal remand statue provides that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . ."  28 U.S.C § 1447(d) (emphasis added); see also In re Lowe, 102 F.3d 731, 736 (4th Cir. 1996) ("[A] federal court loses jurisdiction over a case as soon as its order to remand the case is entered.").  Thus, just as the strict interpretation of removal statutes prevents unnecessary merits litigation, see supra, careful consideration of a removal petition, on the other hand, protects defendants from the incurable depravation of the federal forum to which they are entitled under law.  See Linnin v. Michielsens, ___ F. Supp.2d ___, ___

(E.D. Va. June __, 2005, Case No. 2:05cv108) (see supra note 1), hereinafter Linnin, slip op. at 8 (explaining that "because this Court takes very seriously a defendant's statutory right to a federal forum, and because it is concerned that remand orders are generally unreviewable, it does not believe that remand should be applied mechanically"); Semtek Intern., Inc. v. Lockheed Martin Corp., 988 F. Supp. 913, 914-15 (D. Md. 1997) ("[A] district court should be cautious in denying defendants access to a federal forum because remand orders are generally unreviewable."); Evans v. Gen. Motors Corp., 939 F. Supp. 158, 159 (D. Conn. 1996) ("A federal court must be cautious about remand, lest it erroneously deprive defendant of a right to a federal forum. [internal quotations omitted]."); Cheshire v. Coca-Cola Bottling Affiliated, Inc., 758 F. Supp. 1098, 1100 (D.S.C. 1990) ("[C]ourts must be cautious in denying defendants access to a federal forum since . . . remand orders are generally not reviewable.").  It also ensures that any peculiarly federal interests implicated by a particular case are addressed in a federal forum before the case is summarily and permanently remanded to a state tribunal.  See discussion infra Parts II.C.2 and III.B.

Put simply, federal courts must not interpret removal statutes–or other jurisdictional statutes for that matter–so strictly as to overwhelm the very right that they are intended to confer and the federal interests that they were designed to protect.  Instead, federal courts must interpret removal statutes with recognition that the duty "to exercise jurisdiction where it is conferred, and not to usurp it where it is not conferred, are of *equal* obligation."  Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87 (1809) (Marshall, C.J.) (emphasis added).  While fundamental principles of federalism demand solicitude of state sovereignty, they equally demand that federal statutory and constitutional rights be safeguarded from parochial concerns.

Cf. Younger v. Harris, 401 U.S. 37, 44 (1971) ("[Federalism] does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts.  The Framers rejected both these courses.").

Among the vitally important duties with which federal courts are charged is preserving the balance between state sovereignty and federal supremacy called for by the Constitution.  This is why the threshold determination of jurisdiction is not an inquiry to be taken lightly.  Early in the life of the Republic, Chief Justice John Marshall admonished federal courts to elevate substantive justice above procedural formalism by not avoiding difficult cases simply because they tread up to the outer edges of the jurisdictional boundary outlined by Congress and the Constitution:

> It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should.  The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution.  We cannot pass it by because it is doubtful. . . .  We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.  The one or the other would be treason to the constitution.

Cohens v. State of Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821).

The decision *not* to exercise jurisdiction raises "significant federalism concerns" at least as important as the decision *to* exercise jurisdiction.  Courts ought not presume "that there is something inherently bad about removal" and instead must strive to make the removal procedure "fair to both plaintiffs and defendants alike."  McKinney, 955 F.2d at 927.  The right to remand and the right to remove are of equal import: while certain plaintiffs pleading claims based on state law are entitled to air their grievances before a state tribunal, certain defendants are equally entitled to mount their defense in a federal forum.

10

B.     **Diversity and Alienage Jurisdiction**

The federal diversity and alienage statute provides that:

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between-

(1) citizens of different States;
(2) citizens of a State and citizens or subjects of a foreign state;
(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties . . .

28 U.S.C. § 1332(a).  "In order to establish diversity jurisdiction, the parties must be completely diverse; none of the plaintiffs may share citizenship with any of the defendants."  Owens-Illinois, Inc. v. Meade, 186 F.3d 435, 440 (4th Cir. 1999) (citing Carden v. Arkoma Assocs., 494 U.S. 185, 187 (1990)).  This is the case even when a citizen of a foreign state is involved.  Gen. Tech. Applications, Inc. v. Exro LTDA, 388 F.3d 114, 120-21 (4th Cir. 2004) (holding that non-diverse state citizenship *or* alienage on two sides of a dispute destroys diversity).[4]

In this case, there is no dispute that § 1332(a)'s amount in controversy requirement is satisfied.  Likewise, there is no dispute over the citizenship of the parties involved: Plaintiff 17th Street is a citizen of Virginia; Defendant Markel, the insurer, is a citizen of the United Kingdom; and the remaining Defendants hail from the United Kingdom, New Jersey, and, importantly, Virginia.  As it now stands, "Virginia's presence on both sides of the controversy destroys

---

[4]The complete diversity requirement is derived from § 1332(a) itself.  Unlike the federal diversity and alienage statute, Article III of the Constitution requires only minimal diversity. State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 531 (1967); see also JPMorgan Chase Bank v. Traffic Stream (BVI), 536 U.S. 88, 96 (2002) (implying, though not deciding, that the alienage provision, §1332(a)(2), probably does not "provide[] jurisdiction up to the constitutional hilt"). Additional discussion of the purposes and scope of alienage jurisdiction is contained in Part III.B of this Opinion.

diversity." Exro, 388 F.3d at 120.  However, "[e]arly in its history, [the United States Supreme

Court] established that the citizens upon whose diversity a plaintiff grounds jurisdiction must be

real and substantial parties to the controversy. . . . Thus, a federal court must disregard nominal

or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."

Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 460-61 (1980).  Based on this general principle, federal

courts have developed what is termed the "fraudulent joinder"[5] doctrine to ensure that diversity is

not defeated by the joinder of parties against whom the plaintiff has no reasonable hope of

recovery.

### C.    The Fraudulent Joinder Doctrine

### 1.    No Reasonable Hope of Recovery

The "fraudulent joinder"[6] doctrine permits the exercise of jurisdiction where the

citizenship of the parties dictates otherwise.  Mayes v. Rapoport, 198 F.3d 457, 464 (4th Cir.

1999).  It applies in one of two instances: if "[1]] there is *no possibility* that the plaintiff would be

able to establish a cause of action against the in-state defendant in state court; or . . . [2]] there

has been outright fraud in the plaintiff's pleading of jurisdictional facts."  Hartley v. CSX

---

[5]"Fraudulent joinder" is a legal term of art.  The label is not designed to impugn the integrity of the plaintiff or his attorneys.  Rather, "fraudulent joinder" describes "the rubric applied when a court finds either that no cause of action is stated against the nondiverse defendant, or in fact no cause of action exists."  AIDS Counseling & Testing Ctrs. v. Group W. Telev., Inc., 903 F.2d 1000, 1003 (4th Cir. 1990).  As this Court emphasizes in Linnin, "[c]lever pleading, of course, is neither unethical nor illegal – it is, in fact, good lawyering."  Slip op. at 21.  The "fraudulent joinder" doctrine is nothing but an unfortunately named tool used to ensure that a defendant is not deprived of his right to a federal forum, that peculiarly federal interests are safeguarded, and that "good lawyering [does] not defeat good judging . . ."  Id.; see also additional discussion infra Parts II.C.1 and III.A.2.

[6]See supra note 5.

Transp., Inc., 187 F.3d 422, 424 (4th Cir. 1999) (quoting Marshall v. Mayville Sales Corp., 6

F.3d 229, 232-33 (4th Cir. 1993)) (emphasis in original).  As with a motion for summary

judgment, when scrutinizing a plea of fraudulent joinder, "the court is not bound by the

allegations of the pleadings, but may instead consider the entire record, and determine the basis

of joinder by any means available."  AIDS Counseling & Testing Ctrs. v. Group W. Telev., Inc.,

903 F.2d 1000, 1004 (4th Cir. 1990) (internal quotations omitted).  All issues of fact and law

must be drawn in the plaintiff's favor.  Marshall, 6 F.3d at 232-33.  See also Mayes, 198 F.3d at

464-65 (detailing the legal standard for a plea of fraudulent joinder).

Defendants argue that this case involves the first instance, alleging that 17th Street has no

hope of recovering against any party other than Markel.  To succeed in invoking the fraudulent

joinder doctrine on this ground, Defendants must "negate all possibility of recovery."  Hartley,

187 F.3d at 422.  There is "inherent tension" between this legal standard and the purpose of the

fraudulent joinder doctrine, which this Court elaborated on in Linnin.  See slip op. at 8-11.  As

this Court explained in Linnin, the "no possibility" standard should not be applied rigidly.  Slip

op. at 10-11; see also Riverdale Baptist Church v. Certainteed Corp., 349 F. Supp.2d 943, 947

(D. Md. 2000).  Indeed, "the 'no possibility' standard cannot possibly be taken literally or applied

mechanically."  Linnin, slip op. at 11.  The appropriate course, which comports with the purpose

of the fraudulent joinder doctrine, as well as the federal remand and removal regime discussed

above, see supra Part II.A, is to ascertain "whether there is a reasonable basis for predicting

liability based on the claims alleged."  Linnin, slip op. at 11 (internal quotations omitted); see

also Beaudoin v. Sites, 886 F. Supp. 1300, 1302 (E.D. Va. 1995) (stating that the "no possibility"

standard for fraudulent joinder should be applied as an inquiry to determine whether there exists

a "reasonable possibility that a state court would rule against any of the [defendants]").

## 2.    Peculiarly Federal Interests

In addition, although there is a general presumption in favor of remand, "there are certain cases in which, due to the peculiarly federal interests involved . . . it would be inappropriate to apply a rule resolving every doubt against retaining jurisdiction." Lewis v. Time, Inc., 83 F.R.D. 455, 461 (E.D. Cal. 1979). The legal standard for fraudulent joinder, which directs courts to peer beyond the pleadings when conducting its jurisdictional inquiry, serves also as an invitation to consider all the ramifications of refusing or accepting jurisdiction. Cf. Linnin, slip op. at 10-11 (discussing the scope of review applied to fraudulent joinder pleas and noting that it "appears to be more wide-ranging than the standard of review it is to apply once it has ascertained it"). In so doing, federal courts should take any necessary steps to safeguard "peculiarly federal interests involved." Id.[7] Specifically, when a peculiarly federal interest is implicated, the presumption in

_____

[7]Lewis is the first in a small handful of removal cases applying heightened scrutiny to allegations of fraudulent joinder in cases involving the First Amendment due to the "peculiarly federal interests involved." See Lewis v. Time, Inc., 83 F.R.D. 455, 461 (E.D. Cal. 1979) ("The 'any doubt' standard is particularly inappropriate in the present case where First Amendment interests are seriously implicated."); Medical Lab. Mgmt. Consultants v. ABC, 931 F. Supp. 1487, 1491 (D. Ariz. 1996) ("[T]he underlying goals of diversity and removal jurisdiction strongly support the retention of jurisdiction in cases involving the First Amendment."); Spence v. Flynt, 647 F. Supp. 1266, 1272 (D. Wyo. 1986) ("[T]his Court agrees with Lewis that First Amendment values demand special federal protections."). Though Lewis and its progeny involve the First Amendment, their admonishment to scrutinize cases involving peculiarly federal interests should also be applied outside the First Amendment context when interests and issues that federal courts were designed to address are implicated. See discussion on removal jurisdiction supra Part II.A; cf. Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641 (1981) (explaining, in a case involving whether federal courts may fashion a federal common law right of contribution for defendants held civilly liable under federal antitrust laws, that there are some cases where "our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control"); Koehler v. Bank of Bermuda (New York), Ltd., 229 F.3d

favor of remand should be set aside.  Of course, in so doing, federal courts must still pay due

regard to state sovereignty.  See discussion on removal jurisdiction supra Part II.A.  This case

implicates a peculiarly federal interest in alienage jurisdiction, which is addressed in detail in

Part III.B.


III.    ANALYSIS

   A.      No Reasonable Hope of Recovery

   Defendants' core argument in support of removal is that 17th Street's claim amounts to a

garden variety coverage claim against an insurer.  They contend that 17th Street has masked its

coverage claim under the guise of a complicated business tort so that it could join the non-diverse

Defendants and thwart federal diversity and alienage jurisdiction.  This is no doubt the case.

Stripped to its core, the only cognizable cause of action that 17th Street possesses is one

sounding in contract against Markel, and it possesses no hope of recovering against *any* of the

Defendants in tort.

   1.      Contract Claim

   17th Street's complaint pleads a claim sounding in contract for breach of the Insurance

Agreement, alleging that it suffered damages "[a]s a direct result of the refusal of the defendants

to comply with the terms of [the Insurance Agreement]."  Pl.'s Compl. ¶ 24.  In support of its

removal petition, Defendants contend that the only parties in interest to the contract claim are

---

187, 187 (2d Cir. 2000)  (Sotomayor, J., dissenting from the denial of rehearing in banc)
(asserting, in a case involving the scope of the federal alienage jurisdiction statute, that "[w]hen
issues of such enduring significance are presented, I believe that the Court . . . [must] ensure that
substantial numbers of individuals and corporations are not erroneously deprived of access to our
federal courts").

Markel and 17th Street because the other Defendants are not privies to the Insurance Agreement. Therefore, the remaining Defendants argue that they cannot be subjected to a lawsuit alleging that they breached it.

17th Street alleges that "[o]n or about February 28, 2003, 17th Street Associates, LLP by and through . . . its duly authorized representative, entered into a contract of insurance with Markel International Insurance Company Limited." Id. ¶ 8. The Agreement, which is attached to the complaint as Exhibit A, does not list any third party beneficiaries, nor does the complaint allege any. Additionally, the complaint does not allege that the obligations undertaken by Markel under the Agreement were assigned or that a novation occurred. 17th Street, in fact, acknowledged at oral argument that Markel is the only Defendant that is party to the Insurance Agreement. Since the complaint is ambiguous with respect to which defendants are the subject of 17th Street's contract claim, however, and since determining which defendants are parties to the contract claim sheds light on the merits of the fraudulent joinder plea, it is worth explaining why Markel is the *only* possible defendant in a contract claim.

In Virginia,[8] "[t]he elements of a breach of contract action are: 1) a legally enforceable obligation of a defendant to a plaintiff; 2) the defendant's violation or breach of that obligation; and 3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004) (citations omitted). The Virginia Court of Appeals has

---

[8]Since the complaint does not plead any claims raising a federal question, the substantive law of Virginia, as expounded by the legislature of Virginia and its highest court, controls the resolution of disputes concerning the claims pled. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); United States v. Little, 52 F.3d 495, 498 (4th Cir. 1995) ("In adjudicating non-federal questions, a federal court must apply the law of the state.").

explained that a legally enforceable obligation aries under contract law only when the parties are

privies to the contract:

> The common law requirement of privity of contract is well established.  In Virginia, it is
> settled that no cause of action exists for a claim solely for economic loss, absent privity of
> contract.  Copenhaver v. Rogers, 238 Va. 361, 364, 384 S.E.2d 593, 595 (1989). . . . An
> action on a contract must be brought in the name of the party in whom the legal interest is
> vested.  Cemetery Consultants, Inc. v. Tidewater Funeral Directors Ass'n, 219 Va. 1001,
> 1003, 254 S.E.2d 61, 62 (1979).  Ordinarily, such an interest is vested only in the
> promisee or promisor, and only this person or his privy may sue on the contract.  Id.

APAC-Virginia, Inc. v. Virginia Dept. of Hgwys. & Transp., 9 Va. App. 450, 452, 388 S.E.2d

841, 842 (1990).  These requirements stem from "the major consideration underlying contract

law[, which] is the protection of bargained for expectations."  Filak, 267 Va. at 618, 594 S.E.2d

at 613.

In this case, Markel, the promisor, promised to provide real property insurance to 17th

Street, the promisee, in exchange for the payment premiums.  They are the only parties with

bargained for expectations resulting from the Insurance Agreement.  This Court is not aware of,

and 17th Street has not brought to this Court's attention, any theory sounding in contract under

which it could possibly recover against any Defendant other than Markel.  Viewing the

allegations contained in the complaint, the representations of the parties at oral argument, and all

of the material contained in the record in the light most favorable to 17th Street, and even

drawing every legal inference possible in its favor, it is impossible to identify any legally

enforceable contract obligation other than Markel's obligation to 17th Street and 17th Street's

obligation to Markel.  Thus, Markel is the *only* Defendant against which 17th Street can sustain a

cause of action for breach of contract.  Given this, whether this claim should remain in federal

court now depends on whether there is a reasonable possibility that 17th Street has a valid tort

claim against Markel *and* any of the Defendants.[9]

> ## 2.    Tort Claim

17th Street's complaint also pleads a cause of action in tort stemming from intentional

misconduct and bad faith resulting in loss of a business expectancy, for which it seeks punitive

damages.  The complaint reads as follows:

> 17th Street Associates, LLP has a business relationship with tenants of the Peppers
> Property, which have been severely impacted by the failure of the defendants to comply
> with the terms of [the Insurance Agreement].  The existence of this business relationship
> had the probability of future economic benefit to 17th Street Associates, LLP, the
> defendants knew of the relationship and absent the defendants' intentional misconduct,
> 17th Street Associates, LLP would have continued with the relationship and has suffered
> damages in the form of lost income and rent due to the deliberate and intentional bad faith
> refusal of the defendants to comply with the terms of [the Insurance Agreement].  Such
> actions amount to an independent, willful tort under the circumstances which supports an
> award of punitive damages.

Pl.'s Compl. ¶ 22.

It is firmly established that "in a first-party Virginia insurance relationship, liability for

---

[9]If 17th Street has a valid tort claim against any of the other Defendants, but not Markel,
this Court may sever the claims, remand the tort claim to state court, and exercise jurisdiction
over the contract claim alone.  In fact, even if 17th Street has a valid tort claim against Markel
*and* the other Defendants, the Court may still have the authority to sever the claims and exercise
jurisdiction over the contract claim.  This authority is derived from Federal Rules of Procedure
18, 19, and 20, which govern joinder of parties and claims.  Rule 21, in particular, permits
federal courts to sever "[a]ny claim against a party" and proceed with it separately.  Under that
Rule, a "court has virtually unfettered discretion in determining whether or not severance is
appropriate."  Grigsby v. Kane, 250 F. Supp.2d 453, 456 (M.D. Pa. 2003); accord Carbon Fuel
Co. v. USX Corp., 867 F. Supp. 414, 419 (S.D. W.Va. 1994).  Given the peculiarly federal
interest involved in this case, severance would certainly be appropriate.  See infra Part III.B.
Furthermore, although contract and tort claims may be joined in Virginia, they are two distinct
causes of action arising out of distinct transactions and occurrences, times and dates.  It is
unnecessary to sever the claims in this case, however.  As explained Part III.A.2, infra, 17th
Street has no hope of recovering in tort against *any* of the Defendants, including Markel.  17th
Street's tort claim therefore will not be severed, but instead dismissed altogether.

bad faith conduct is a matter of contract rather than tort law.  The obligation arises from the

agreement and extends only to situations connected with the agreement."  <u>A & E Supply Co., Inc.</u>

<u>v. Nationwide Mut. Fire Ins. Co.</u>, 798 F.2d 669, 676 (4th Cir. 1986) (citing <u>Reisen v. Aetna Life</u>

<u>and Casualty Co.</u>, 225 Va. 327, 335, 302 S.E.2d 529, 533 (1983)).  Indeed, Virginia is among

"the jurisdictions that have declined to recognize a remedy in tort for refusal in bad faith to honor

a first-party insurance claim."  <u>Id.</u>  This rule is supported by strong policy considerations:

> It would skew the predictability necessary for stable contractual relations if a breaching
> party were suddenly subject to the more open and unanticipated duties and damages
> imposed by the law of tort. . . . The circumstances surrounding the dissolution of
> contractual relations are so frequently beset by strain and suspicion that perceptions of
> improper motive on the part of an opposing party are commonplace.  Breach of contract
> would thus routinely give rise to an action in tort, with its attendant incentive of a
> punitive award.  The Virginia Supreme Court has noted that "the overwhelming weight of
> authority continues to resist this tendency."  <u>Kamlar v. Haley</u>, 224 Va. 699, 706, 299
> S.E.2d 517, 518 (1983).

<u>Id.</u> at 671-72.  Punitive damages are not available in Virginia for breach of a contractual duty,

"regardless of the motives underlying the breach."  <u>Kamlar v. Haley</u>, 224 Va. 699, 707, 299

S.E.2d 514, 518 (1983); <u>accord</u> <u>A & E Supply Co.</u>, 798 F.2d at 671-72.  Consequently, in order

to recover punitive damages where there is a breach of contract, a plaintiff must allege and prove

"an independent, willful tort, beyond mere breach of a duty imposed by contract."  <u>Kamlar</u>, 224

Va. at 707, 299 S.E.2d at 518; <u>accord</u> <u>A & E Supply Co.</u>, 798 F.2d at 672.  17th Street has failed

to allege an independent, willful tort against *any* of the Defendants.

Virginia permits the joinder of independent tort and contract claims.  <u>Kamlar</u>, 224 Va. at

707, 299 S.E.2d at 518.  In the context of this case, "an 'independent tort' is one that is factually

bound to the contractual breach but whose legal elements are distinct from it."  <u>A & E Supply</u>

<u>Co.</u>, 798 F.2d at 672.  Virginia courts "have acknowledged that a party can, in certain

19

circumstances, show both a breach of contract and a tortious breach of duty." Richmond Metro Auth. v. McDevitt Street Bovis, Inc., 256 Va. 553, 558, 507 S.E.2d 344, 347 (1998) (citing Foreign Mission Bd. v. Wade, 242 Va. 234, 241, 409 S.E.2d 144, 148 (1991)). "However, 'the duty tortiously . . . breached must be a common law duty, not one existing between the parties solely by virtue of the contract.'" Id. (quoting Foreign Mission Bd., 242 Va. at 241, 409 S.E.2d at 148 (additional citation omitted)).

17th Street's complaint is ambiguous as to exactly what tort is constituted by the "deliberate and intentional bad faith refusal of the defendants to comply with the terms of [the Insurance Agreement]." Pl.'s Compl. ¶ 22. The mere fact that the complaint contains the words "independent, wilful tort" is insufficient in and of itself to state a cognizable claim. See Migdal v. Rowe Price-Fleming Intern, Inc., 248 F.3d 321, 326 (4th Cir. 2001) (explaining that "[t]he presence of a few conclusory legal terms does not insulate a complaint from dismissal" for failure to state a claim); see also Waters v. State Farm Mut. Auto. Ins. Co., 158 F.R.D. 107, 109 (S.D. Tex. 1994) ("Failure to specify a factual basis for recovery against a non-diverse party constitutes a failure to state a claim and fraudulent joinder of that party."). Instead, the complaint must contain facts supporting the legal conclusion of liability. Id. 17th Street contends that the intentional misconduct and bad faith claim should be construed as a claim for intentional interference with a business expectancy and that the complaint contains sufficient facts to support finding each named Defendant liable.

In Virginia, tortious interference with a contract or business expectancy requires proof of four elements:

1) the existence of a valid contractual relationship or business expectancy; 2) knowledge

20

of the relationship or expectancy on the part of the interferor; 3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and 4) resultant damage to the party whose relationship or expectancy has been disrupted.

Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985); accord Rappahannock Pistol & Rifle Club, Inc. v. Bennett, 262 Va. 5, 12, 546 S.E.2d 440, 443 (2001).  17th Street argues that the complaint contains the factual allegations necessary to plead a prima facie case: 1) that it possessed a business expectancy in the form of proceeds from the oral leases it had with tenants of the Peppers Property; 2) that the Defendants were aware of the relationship; 3) that the Defendants intentionally interfered with that relationship by failing to fulfill the terms of the Insurance Agreement in intentional bad faith; and 4) that its business expectancy went unfulfilled due to Defendants' intentional bad faith.

These allegations are factually insufficient to plead a claim for intentional interference with a business expectancy on two grounds.  First, as Defendants correctly point out, Virginia caselaw applying the tort of intentional interference with a business expectancy contain a fifth, unstated element to the prima facie case: a competitive relationship between the party interfered with and the interferor.  See, e.g., Rappahannock Pistol, 262 Va. at 5, 546 S.E.2d at 440 (involving purchasers competing to buy the same tract of land); Maximus, Inc. v. Lockheed Information Mgmt Sys. Co., Inc., 254 Va. 408, 493 S.E.2d 375 (1997) (involving competing companies bidding for a government services contract); Hilb, Rogal & Hamilton Co. of Richmond v. DePew, 247 Va. 240, 440 S.E.2d 918 (1994) (involving competing pension trust businesses run by a former employer and a former employee); Catercorp, Inc. v. Catering Concepts, Inc., 246 Va. 22, 431 S.E.2d 277 (1993) (involving competing catering businesses run by a former employer and a former employee); Krantz v. Air Line Pilots Assoc., Int'l, 245 Va.

202, 427 S.E.2d 326 (1993) (involving a union and a former member, though the court held that no prima facie case was stated); Century-21 v. Elder, 239 Va. 637, 391 S.E.2d 296 (1990) (involving a real estate agent's client and an independent builder's attempt to sell a home to that client); Chaves, 230 Va. at 112, 335 S.E.2d at 97 (involving competing architects bidding for a government services contract).

Second, in each of these cases, there is also an allegation that the defendant had some contact with the source of the plaintiff's alleged business expectancy. For instance, in Rappahannock Pistol, the defendant-competitor land purchaser had several contacts with the land seller with whom the plaintiff already had a contract to purchase the land from. 262 Va. at 8-11, 546 S.E.2d at 441-43. Similarly, in Chaves, the defendant-competitor architect sent a letter to the city council responsible for deciding to whom to award the services contract that the plaintiff and defendant were competing for. 230 Va. at 114-18, 335 S.E.2d at 98-101. Like the existence of a competitive relationship between the plaintiff and the defendant, contact by the defendant with the source of the plaintiff's business expectancy, direct or indirect, is a de facto prima facie element of a claim for tortious interference with a business expectancy.

The reason that the tort of intentional interference with a business expectancy always involves a competitive relationship and allegations of direct contact with the source of the expectancy are self-evident: they provide prima facie evidence of a motive to interfere and indicate that the interference actually took place. In other words, the existence of a competitive relationship between a plaintiff and a defendant is the factual circumstance giving rise a common law duty actionable in tort. That relationship is absent here – 17th Street is not in a competitive relationship with any of the Defendants. Hence, there is no common law duty actionable in tort

running from any of the Defendants to 17th Street.  The only relationship that exists is a contractual one between 17th Street and Markel, which, of course, is *only* actionable in contract. See supra Part III.A.1.

What is more, the complaint does not allege that any of the Defendants ever made contact with the tenants of the Peppers Property, the source of 17th Street's business expectancy.  There is no prima facie evidence supporting a claim that an interference actually took place.  In any event, even if the Defendants acted in bad faith, that alone is insufficient to bring an action in tort.  Virginia tort law simply "cannot so easily accommodate an action for bad faith performance in insurance contracts.  Because every agreement involves some variation of the duty of good faith, the remedy would quickly expand beyond its original basis."  A & E Supply Co., 798 F.2d at 677.  17th Street stands no chance of succeeding on a claim of intentional interference with a business expectancy.

17th Street argues that, since the additional elements of a prima facie case for intentional interference with a business expectancy are not explicitly required by the Supreme Court of Virginia, the case should be remanded because there is at least a glimmer of hope that it might convince a Virginia court that its claim has merit.  The argument is thoroughly unconvincing.  To remand the case, this Court would have to stamp its imprimatur on a legal theory whereby a defendant in a non-competitive relationship with a plaintiff, that never had *any* contact with the subject of the plaintiff's business expectancy, could be held liable for tortious interference with that expectancy and be forced to pay punitive damages.  This the Court cannot do.  The string of cases cited above make clear that the Supreme Court of Virginia would not extend the tort of intentional interference with a business expectancy to the factual context presented here.  See

23

<u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998) ("It is axiomatic that in determining state law a federal court must look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications. [internal quotations and citations omitted].").  Indeed, where "the Supreme Court of Virginia has never recognized [] a cause of action[,] . . . it would be inappropriate for this Court to do so in the first instance. . . ." <u>Sellers v. School Bd. of the City of Manassas, Virginia</u>, 960 F. Supp. 1006, 1012 (E.D. Va. 1997) (Ellis, J.); <u>accord</u> <u>Gravins v. Int'l Playtex, Inc.</u>, 586 F. Supp. 251, 252 (E.D. Va. 1984) (Warriner, J.).

### 3.   Conclusion

At bottom, this is a garden variety coverage claim against an insurer cloaked in the garb of a complex business tort for the tactical purpose of defeating diversity and alienage jurisdiction (and perhaps in the hope of recovering punitive damages).  <u>Cf.</u> <u>Wiles v. Capitol Indemnity Corp.</u>, 280 F.3d 868, 870 (8th Cir. 2002) ("An insured cannot recast a contract claim as a conspiracy tort under Missouri law."); <u>Linnin</u>, slip op. at 18-21 (discussing the "procedural gamesmanship" involved in joining employees to lawsuits against employers); <u>Ayoub v. Baggett</u>, 820 F. Supp. 298, 299-300 (S.D. Tex. 1993) ("[G]iven the relative financial positions of most companies versus their employees [or agents], the only time an employee [or agent] is going to be sued is when it serves a tactical legal purpose, like defeating diversity.").  This Court sees right through that deceptive garb.

That said, it is important to emphasize that "[c]lever pleading . . . is neither unethical nor illegal – it is, in fact, good lawyering."  <u>Linnin</u>, slip op. at 21; <u>see also</u> <u>supra</u> note 5.  However, "good lawyering should not defeat good judging, which requires a court to call things as it sees them."  <u>Id.</u> slip op. at 21.  17th Street's grievance is with Markel–and Markel *alone*–under a

theory arising out of contract law; it has no actionable grievance in tort against any of the Defendants.

### B. Peculiarly Federal Interests: Diversity and Alienage Jurisdiction

While it is evident that 17th Street possesses no hope of recovering against any Defendant other than Markel in this case, even if that question were closer, this case involves a peculiarly federal interest warranting the elimination of the general presumption in favor of remand because one of the Defendants is a citizen of the United Kingdom. That being the case, the ramifications of exerting or not exerting alienage jurisdiction extend "well beyond our government, to our relations with foreign nations, and the access of foreign entities and individuals to the federal courts." Koehler v. Bank of Bermuda (New York), Ltd., 229 F.3d 187, 187 (2d Cir. 2000) (Sotomayor, J., dissenting from the denial of rehearing in banc).

It is well-settled that the purpose of diversity jurisdiction is to provide non-diverse parties to a lawsuit with access to a forum free from actual and perceived local prejudice. As Chief Justice Marshall explained:

> However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states.

Deveaux, 9 U.S. (5 Cranch) at 87; see also Roche v. Lincoln Prop. Co., 373 F.3d 610, 620 (4th Cir. 2004) ("The obvious and elementary policy behind diversity jurisdiction is that an out-of-state defendant should be entitled to a federal forum if he decides that he cannot receive a fair trial in a state court due to local prejudice."). Indeed, the integrity of the United States court

system, federal and state, relies on the belief that justice is administered blindly, without regard

to citizenship or other factors unrelated to the merits of a case.  That said, diversity jurisdiction is

not premised on the view that state courts are incapable of administering justice fairly, for "they

surely are."  Linnin, slip op. at 8.  Rather, diversity jurisdiction ensures that any misapprehension

a non-citizen litigant may have about the impartiality of a local tribunal does not in turn corrode

the confidence that the entire populace has in the court system and the rule of law.

> The foundation of the right of citizens of different States to sue each other in the courts of
> the United States, is not an unworthy jealously of the impartiality of the state tribunals.  It
> has a higher aim and purpose.  It is to make the people think and feel, though residing in
> different States of the Union, that their relations to each other were protected by the
> strictest justice, administered in courts independent of all local control or connection with
> the subject-matter of the controversy between the parties to a suit.

Dodge v. Woolsey, 59 U.S. (18 How.) 331, 354 (1855).

While the purpose of diversity jurisdiction is clear, "there is some question how important

it really was in the thinking of the framers of the Constitution."  Tango Music, LLC v. Deadquick

Music, Inc., 348 F.3d 244, 246 (7th Cir. 2003) (Posner, J.) (citations omitted).  Diversity

jurisdiction's first cousin, alienage jurisdiction, however, was of critical importance to the

Framers and the members of the First Congress.  See Kevin R. Johnson, Why Alienage

Jurisdiction? Historical Foundations and Modern Justifications for Federal Jurisdiction Over

Disputes Involving Noncitizens, 21 YALE J. INT'L. L. 1, 6-20 (Winter 1996).  Though they are

often coupled together, and are in fact included in the same statutory provision, 28 U.S.C. §

1332(a), more exacting scrutiny of the historical context in which alienage jurisdiction was

conceived reveals that the rationale underpinning it is distinct from diversity jurisdiction and that

its purpose is to protect peculiarly federal interests that federal courts were specifically designed

to adjudicate.  See id.

In the wake of the American Revolution, pervasive anti-British sentiment fueled by the war, difficult economic times, and high debt loads led to debtor insurrections, the passage of debtor relief laws in many states, and a general refusal by state courts to enforce the rights of British creditors.  See id. at 6-10.  This brought the foreign policy agenda of the new American Confederacy, as well as the collective interest in steady foreign investment and smooth foreign commercial relations, into loggerheads with the individual conduct of states.  See id.  At the Constitutional Convention, James Madison described the problem bluntly: "We well know, sir, that foreigners cannot get justice done them in these courts, and this has prevented many wealthy gentlemen from trading or residing among us."  3 Debates on the Federal Constitution 583 (J. Elliot ed. 1876).  Specifically,

> [b]oth during and after the Revolution, state courts were notoriously frosty to British creditors trying to collect debts from American citizens, and state legislatures went so far as to hobble British debt collection by statute, despite the specific provision of the 1783 Treaty of Paris that creditors in the courts of either country would 'meet with no lawful impediment' to debt collection.  Definitive Treaty of Peace, United States-Great Britain, Art. IV, 8 Stat. 82; [additional citation omitted].  Ultimately, the States' refusal to honor the treaty became serious enough to prompt protests by the British Secretary of State, particularly when irked by American demands for treaty compliance on the British side. [citation omitted].

JPMorgan Chase Bank v. Traffic Stream (BVI), 536 U.S. 88, 94 (2002).  Based on this, the United States Supreme Court has concluded that "[t]his penchant of the state courts to disrupt international relations and discourage foreign investment led directly to the alienage jurisdiction provided by Article III of the constitution."  Id.

While Article III's alienage provision permits Congress to actualize alienage jurisdiction, rather than taking the added step doing so itself, it is telling that "the First Congress granted

federal courts the alienage jurisdiction authorized in the Constitution, even while general federal-question jurisdiction was withheld." Id. at 96.[10]  Indeed, "the proponents of the Constitution . . . made it quite clear that the elimination or amelioration of difficulties with credit was the principal reason for having alienage and diversity jurisdictions, and that it was one of *the most important reasons* for a federal judiciary."  Wythe Holt, To Establish Justice: Politics, the Judiciary Act of 1789, and the Invention of the Federal Courts, 1989 DUKE L.J. 1421, 1473 (Dec. 1989) (emphasis added), quoted in Traffic Stream, 536 U.S. at 95.  Thus, though the statutory alienage provision is not necessarily as broad as the provision contained in Article III, section 2, clause 1, see supra note 4, "there is no doubt that the similarity of § 1332(a)(2) to Article III bespeaks a shared purpose."  Traffic Stream, 536 U.S. at 96.  In short, the Founding Generation prioritized providing a federal forum in cases involving alien litigants because it was viewed as central to the success and stability of the new Republic.

The historical record is clear that the Framers were hypersensitive to the impact that individual states, acting in their narrow interests, could have over the collective well-being of the country.  It was that hypersensitivity, borne of economic and political insecurity under the Articles of Confederation, that led to the calling of the Philadelphia Convention and eventual ratification of the Constitution.  Cf. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 317 (1936) ("The Framers' Convention was called and exerted its powers upon the irrefutable

---

[10]Broad federal question jurisdiction was not fully conferred on federal courts until passage of the 1875 Judiciary Act, just shy of a full century after the First Congress had already actualized alienage jurisdiction in the Judiciary Act of 1789.  What is more, the amount in controversy requirement was not removed from the federal question jurisdiction statute until 1980.  See, generally, Richard Fallon, Jr., et al, Hart & Weshsler's The Federal Courts and The Federal System, 826-31 (5th ed. 2003) ("Note on the Statutory Development of the Jurisdiction").

postulate that though the states were several their people in respect of foreign affairs were one."). The key distinction between confederation and nationhood is that nationhood requires the channeling of issues and controversies that affect the national interest to federal institutions.  For example, the Legislature's interstate commerce authority, the Executive's foreign relations power, and the Judiciary's alienage jurisdiction all illustrate ways in which the Framers reduced local influence and control over issues that affected the well-being of the entire country.  The very purpose of undoing the Articles of Confederation and ratifying the Constitution was to ensure that parochial political, economic, or other interests did not overwhelm the collective interests of the United States.  Alienage jurisdiction is a direct reflection of that.  See The Federalist No. 80, at 535 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (explaining that alienage jurisdiction "rests on this plain proposition, that the peace of the WHOLE ought not to be left at the disposal of a PART").

The power to create federal courts and confer them with alienage jurisdiction is one of the most important tools that the Constitution affords Congress to safeguard the collective interest of the Union.  Its importance extends beyond merely protecting foreign investment and international commercial contracts; it encompasses our security and our relationship with foreign nations.  In Federalist No. 80, Hamilton advocated for alienage jurisdiction on the ground that "the denial or perversion of justice by the sentence of courts . . . is with reason classed among the just causes of war, [thus] it will follow that the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned.  This is not less essential to the preservation of public faith, than to the security of the public tranquility."  Id. at 536.  Indeed, "[t]he raison d'etre of alienage jurisdiction is to avoid entanglements with other sovereigns that might ensue

from failure to treat the legal controversies of aliens on a national level." <u>Matimak Trading Co.</u>

<u>v. Khalily</u>, 118 F.3d 76, 82 (2d Cir. 1997), <u>abrogated by</u> <u>Traffic Stream</u>, 536 U.S. at 82; <u>see also</u>

<u>Tango Music</u>, 348 F.3d at 246 ("A reinforcing consideration is the desirability of promoting

international harmony . . . by giving foreigners access to the national court system, where they are

less likely to encounter provincial prejudices when litigating against U.S. citizens. . . .").

So, while diversity jurisdiction guarantees non-diverse litigants a tribunal free from actual

and perceived prejudice, alienage jurisdiction additionally protects the Nation's economic and

political security and advances international comity and tranquility.  "The importance of these

goals has only increased with time as both international relations and global trade have become

more complex and our nation has assumed a central role in both." <u>Koehler</u>, 229 F.3d at 193

(Sotomayor, J., dissenting).  When alien parties are involved, peculiarly federal interests are

unquestionably implicated.  As a consequence, thwarting federal jurisdiction in alienage cases

undermines the critically important collective interests safeguarded by the federal jurisdictional

scheme – both statutory and constitutional.

In a case such as this, when a domestic plaintiff pleads claims clearly lacking substantive

merit against non-diverse defendants in an attempt to avoid federal jurisdiction, the general

presumption in favor of remand, which often results in the incurable deprivation of a federal

forum with barely any scrutiny at all, should be set aside in favor of careful review to determine

whether the exercise of federal alienage jurisdiction is appropriate and necessary.  Since this case

involves a Defendant hailing from the United Kingdom, Markel, a special irony would result

from unjustly denying it a federal forum, as the United Kingdom "is not only a strong ally, but

[is] the very country the drafters of the alienage jurisdiction provision had in mind more than two

hundred years ago when they sought to open the federal courts to foreign litigants." <u>Id.</u> at 189

(Sotomayor, J., dissenting).  Since Markel is the only true Defendant in interest in this case, <u>see</u>

<u>supra</u> Part III.A, and, under some circumstances, even if it were not, <u>see</u> <u>supra</u> note 9, the

exercise of removal jurisdiction is necessary to safeguard the peculiarly federal interests

implicated by Markel's alien status.


**IV.     CONCLUSION AND ORDER**

The question whether this Court should exercise jurisdiction over this case implicates

federalism and constitutional issues of profound significance – admittedly, much more so than

the parties to this litigation probably bargained for.  This Court is charged with balancing the

sovereignty of the Commonwealth of Virginia, in particular protecting the sanctity of its laws

from federal intrusion, against the peculiarly federal interest in ensuring that foreign individuals

and corporations who enter into contracts with domestic individuals and corporations will be

treated fairly and have their contractual rights enforced, lest the confidence that foreigners have

in engaging in commerce with Americans and our foreign relations with their sovereign be

irreparably damaged.

This Court has the power to set those competing interests aside and summarily remand

this case to the state court from which it came.  Thus, the easiest step for this Court to take,

which is subtly encouraged by the law of remand and fraudulent joinder, would be to pat the

parties on the back and show them to the door leading to state court.  Moreover, the door back to

federal court would be forever locked to the Defendants.  The fact of the matter is, rigid

application of the law of remand and fraudulent joinder might lead to that result.  Careful

scrutiny of the interests at stake in the litigation and the substantive merits of the claims pled, on the other hand, as well as careful consideration of the role of federal courts in determining jurisdiction and protecting peculiarly federal interests, demands the contrary result.  By employing the fraudulent joinder doctrine the way it was intended to be used, as a tool for detecting attempts to thwart federal jurisdiction where there exists a countervailing right or federal interest requiring otherwise, leads to the result here: exercising removal jurisdiction over the case and dismissing the non-diverse (and other) Defendants against which Plaintiff bears no reasonable hope of recovery.

Accordingly, for the foregoing reasons:

1)  Defendants' petition for removal is **GRANTED** and this case is hereby **REMOVED** from the Circuit Court of the City of Virginia Beach, Virginia to this Court;

2)  Plaintiff's Motion to Remand is **DENIED**;

3)  Count One of the Complaint, which pleads a tort claim for intentional misconduct and bad faith resulting in the loss of a business expectancy, is **DISMISSED**;

4)  Defendants Certain Underwriters, Raphael & Associates, Stolzberg, Associated Adjusters, and Howard are **DISMISSED** from the case; and

5)  Defendants' Motion to Dismiss is **MOOT**.

The Clerk of the Court is **DIRECTED** to forward a copy of this Memorandum Opinion and Order to counsel of record in the above-captioned matter.

**IT IS SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

June     , 2005